## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

In Re:

**GABLES MANAGEMENT, LLC,**

                    **Debtor.**

**Bankruptcy Case
No. 10-42241-JDP**

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

Joseph M. Meier, COSHO HUMPHREY, LLP, Boise, Idaho, Attorney for Trustee.

Craig W. Christensen, CRAIG W. CHRISTENSEN, CHTD., Pocatello, Idaho, for Creditors.

*I.*
*Introduction*

Creditors Ernie and Patricia Geiger and June Geiger ("Ernie",

"Patricia" and "June" individually[1]; collectively "Creditors") filed claims in

_____

[1] We refer to creditors by first names for clarity; no disrespect is intended.

MEMORANDUM OF DECISION – 1

this chapter 11[2] case.  The chapter 11 trustee, R. Wayne Klein ("Trustee")

objected to the claims.  Exs. 200-01, 206-07; Dkt. Nos. 237-38.  Creditors

responded to Trustee's objections, Dkt. Nos. 261-64, and on April 11, 2012,

the Court conducted a hearing.  At the hearing, exhibits and testimony

were submitted by the parties, and thereafter, the issues were taken under

advisement.

The Court has considered the submissions of the parties, the

testimony presented, the arguments of counsel, as well as the applicable

law.  This Memorandum constitutes the Court's findings and conclusions,

and resolves the issues raised by Trustee's objections.  Fed. R. Bankr. P.

7052; 9014.

## II.
### Facts

In November 2007, June established her residence at Gables of

Pocatello, a company solely owned and operated by Debtor, Gables

---

[2]  Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001 – 9037, and all "Civil Rule"
references are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION – 2

Management, LLC.  Gables of Pocatello is an assisted living facility which

provides residents various levels of care depending upon their needs.

While visiting June, her son, Ernie, and his wife, Patricia, would often see a

man at the facility named Keith Rasmussen ("Rasmussen") who

introduced himself as the owner of Gables of Pocatello.[3]

In February 2009, Rasmussen called Ernie and Patricia and asked if

they were interested in making a loan.  He explained that an investor in

Gables of Pocatello wished to have his investment money returned, and

Rasmussen told Ernie and Patricia that he wanted to replace that

investment with other investments in smaller increments, so that it would

be easier to return invested funds in the future, should he be requested to

do so.  Rasmussen told Ernie and Patricia that he would retain their money

---

[3] In addition to Gables of Pocatello, Rasmussen apparently owned the equity in and operated Gables of Ammon, Gables Special Needs, Country Gables, Gables of Shelley, and Gables of Blackfoot.  Ex. 209.  Gables of Preston and Gables of Rigby were also proposed.  *Id*.  It is unclear on this record whether ground was ever broken on the construction of those facilities.  Some of those facilities were built and subsequently sold to others.  At all times relevant, Gables of Pocatello was owned and operated by Debtor.  It is unclear whether Rasmussen was the sole owner of Debtor.

MEMORANDUM OF DECISION – 3

for no more than three years, that he would not touch the principal, and

that he would pay them interest at the rate of 16% per annum.  Rasmussen

also agreed to execute a Promissory Note ("Note") and a Deed of Trust

("DOT") in favor of Ernie and Patricia to ensure that their money was safe.

Creditors agreed to provide funds to Rasmussen in response to his

offer.  Ernie and Patricia gave $25,000 to Rasmussen on February 10, 2009.

With Ernie and Patricia's blessing, June also gave Rasmussen $25,000 on

February 24, 2009, with Ernie signing some of the documents in her behalf

via a power of attorney.[4]  Exs. 201, 210.  The money was given to

Rasmussen in the form of checks, each made payable to Gables

Management.[5]  *Id*.  It is undisputed that these funds were actually received

---

[4] Interestingly, the only power of attorney in the record is the Health Care
Durable Power of Attorney of June Geiger, which does not purport to give Ernie
any power to make financial decisions or execute any documents except those
related to June's health care.  This issue has not been raised by the parties, and
the Court will not take it up *sua sponte*.

[5] June gave Debtor $25,000 via one cashier's check, Ex. 201, while Ernie
and Patricia's money was received in two separate checks totaling $25,000, Ex.

MEMORANDUM OF DECISION – 4

by Debtor, and not by Rasmussen in his individual capacity.

In consideration of these transfers, each month, from March 2009 through October 2010, June was given a $333.33 credit on her monthly rent by Debtor.  Exs. 202-03.  Ernie and Patricia also received $333.33 checks from March 2009 through June 2009, but then the parties' agreed-upon arrangement began to falter.  Ex. 212.  The checks began to either arrive late, or sometimes not at all, after which the payments would get back on track for a few months, only for new payment issues to again arise.  *Id.* The last payment check Ernie and Patricia received was in November, 2010. *Id*.

On September 6, 2010, Ernie and Patricia wrote Rasmussen a letter by which they formally requested the return of both the $25,000 they had given him, as well as June's $25,000.  Ex. 213.  It also appears that, at about that time, Creditors consulted an attorney, Mr. Holmes, about June's money.  Mr. Holmes sent Rasmussen a letter regarding June's money, and

---

210.  Trustee testified that all the checks received from Creditors were deposited into two separate accounts belonging to Debtor.  *See* Ex. 104.

MEMORANDUM OF DECISION – 5

Rasmussen replied to that letter on November 1, 2010, using Debtor's

letterhead.  Ex. 205.  In the letter, Rasmussen explained Debtor's financial

difficulties, and proposed that the interest rate governing the transaction

be reduced from sixteen percent to eight percent.  *Id*.  He also proposed to

reduce June's rent to $2,000 per month, and to thereupon apply a credit of

$1,220 to interest and principle payments.  *Id*.  Attached to the letter was

an amortization schedule.  *Id*.  While not completely clear from the record,

it appears that Creditors agreed to this arrangement for payment of June's

obligation, because in both November and December 2010, June was given

a $1,220 credit against her rent.  Ex. 203.

On December 18, 2010, Debtor filed a chapter 11 petition.  On

Creditors received another letter from Debtor dated October 29,

2010.  Ex. 214.  This lengthy letter outlines in some detail Debtor's financial

woes as well as its plans for the future, and assures its "investors" that the

goal is to ensure that they receive all of their principal and interest.  *Id*.

On December 18, 2010, Debtor filed a chapter 11 petition.  On

schedule F, Debtor listed Ernie Geiger as a creditor holding an unsecured,

MEMORANDUM OF DECISION – 6

nonpriority claim in the amount of $25,000 for a "loan."  Dkt. No. 39.  It is

unclear whether Ernie Geiger is listed as a creditor for the $25,000 that he

and Patricia gave to Debtor, or as June's representative under the power of

attorney regarding her transaction with Debtor.  Regardless, only one of

the two $25,000 transactions between Creditors and Rasmussen is listed in

Debtor's schedules.

Creditors filed proofs of claim in Debtor's bankruptcy case.  Claims

Regis. Nos. 34, 35.[6]  Creditors listed the basis for both claims as

"investment."  Dkt. Nos. 200-01; 206-07.  Trustee objected to the claims.

Dkt. Nos. 237-38.

///

### III.
### *The Transactions*

---

[6] The original proofs of claim were filed on April 13, 2011, and were
amended on April 28, 2011.  The amendments added supporting documentation.
Subsequent to the hearing on Trustee's objection, Trustee and Creditors filed a
stipulation regarding the correct amounts claimed by each of the Creditors.  Dkt.
No. 355.  Ernie and Patricia's claim is in the amount of $25,333.33; June's claim is
for $22,886.31.  *Id*.

MEMORANDUM OF DECISION – 7

To resolve the issues raised by Trustee's objection, it is necessary to consider the documentation used by the parties in these transactions. As described below, Creditors were given a "packet" of documents to sign to effect each of the transactions.

**A.  Ernie and Patricia**

1.  <u>Investor Contract</u>

Ernie and Patricia's packet included a document on Gables letterhead entitled "Gables Management Investor Contract" ("Investor Contract").  Dkt. Nos. 206-07.  In the Investor Contract, Ernie and Patricia are referred to as "Investor;" Rasmussen signed this document as the "Owner."[7]  *Id*.  The Investor Contract was executed on February 12, 2009, and indicates that the "amount of investment" was $25,000.  *Id*.  According to its terms, the Investors could withdraw their "investment" at the end of three years, at which time they would realize a 16% annual return on their

---

[7]  Ernie and Patricia's Investor Contract bears Patricia's signature, although it appears Rasmussen inadvertently signed on the "Investor" line, Exs. 206-07.

MEMORANDUM OF DECISION – 8

investment.  *Id*.  Ernie and Patricia's Investor Contract does not provide for

the interest payments of $333.33 per month, but rather provides that,

beginning in the fourth year, a "monthly net dividend shall be dispersed

to investor every six months . . . ."  Exs. 206-07.

The Investor Contract also indicates that upon withdrawal of their

funds, Ernie and Patricia would be given a form that "will act as an

investor notification, and will show the Internal Revenue Service (IRS) that

a taxable distribution has been performed."  *Id*.  Finally, Ernie and

Patricia's Investor Contract provides that "[i]f the building is sold or

refinanced the investor has the option to be cashed out."  *Id.*

2.  Promissory Note

The packet of forms Ernie and Patricia received also included a

promissory note, executed on February 12, 2009, by "Keith Rasmussen" as

the "Borrower" listing his personal address.  Ex. 207.  Debtor is not

mentioned anywhere on the Note, and the Note does not appear on Gables

letterhead.  *Id*.  The Note promises to pay monthly installments of $333.33

MEMORANDUM OF DECISION – 9

to Ernie and Patricia, and that if not paid off earlier, then the Note "is due

and payable in full on "3 Third [sic] year anniversary date". *Id*.

### 3.  Deed of Trust

Ernest and Patricia's packet also contained the first page of a

preprinted Deed of Trust, dated February 12, 2009.  Ex. 208.  The DOT was

not on Gables letterhead, and lists Keith Rasmussen as grantor, and

Patricia and Ernie Geiger as beneficiaries.  *Id*.  The DOT purports to grant

Ernie and Patricia an interest in the property located at 2805 S. Grant,

Debtor's assisted living facility, located in Pocatello, Bannock County.  *Id*.

However, the legal description contained in the DOT is for property

located in Bingham County.  *Id*.  As noted, the DOT is incomplete, shows

no signatures, and was never recorded.

## B.  June's Transaction

### 1.  Investor Contract

June's packet also included a document entitled "Gables

Management Investor Contract," and, like the other one, appears on

MEMORANDUM OF DECISION – 10

Gables letterhead.  Dkt. Nos. 206-07.  It is dated and signed on February

24, 2009, and indicates that the "amount of investment" is $25,000.  *Id*.  The

contract parties are Keith Rasmussen as "owner," and Ernie Geiger,

presumably in his capacity as one with power of attorney for his mother,

June.  *Id*.

For the most part, this contract is identical in substance to that

executed by Ernie and Patricia.  However, June's contract provides that

she, as the "Investor," will receive "monthly interest payments" of $333.33

in the form of reduced rent payments for her rent at Gables of Pocatello.

Ex. 201.

### 2.  Promissory Note

The Note executed by "Keith R. Rasmussen" and Ernie Geiger is, in

substance, the same in form as that given to Ernie and Patricia.

///

### 3.  Deed of Trust

Patricia testified that June's packet of documents also included a

MEMORANDUM OF DECISION – 11

DOT, but a copy of that document was not submitted to the Court. It also

was apparently incomplete and not recorded.

4.  Investment Agreement

The hearing record included one additional document executed

between Ernie and Keith Rasmussen in connection with June's transaction,

entitled "June Geiger Investment Agreement" ("Investment Agreement").

Ex. 201.  The Investment Agreement recites that June had made a $25,000

investment at sixteen percent interest, totaling $333.33 in monthly interest.

*Id*.  The Investment Agreement references the fact that it is "[s]ecured only

with a Promissory Note to Ernie Geiger," and provides that the interest is

to be deducted from June's rent, and will show up in her monthly

statements as a reduction in paid up rent.  *Id*.  The Investor Agreement

specifies that, in the event of June's death, her interest should be paid to

Ernie Geiger.  *Id*.

*IV.*
*Analysis and Disposition*

Trustee's objections to Creditors' claims argue that the documents

MEMORANDUM OF DECISION – 12

evidencing the transactions with Ernie and Patricia, and with June, all

obligate that they be repaid by Rasmussen in his individual capacity, and

not by the Debtor.  At the hearing, after considering the evidence, the

Court announced its tentative belief that the transactions were more likely

transactions between Creditors and Debtor, and not with Rasmussen in his

individual capacity.  It is clear that Rasmussen represented himself to

Creditors as the owner of Debtor, and that many of the transaction

documents were set out on Gables letterhead, although some documents

also appear to evidence agreements between Creditors and Rasmussen

individually.  It is also undisputed that Creditors' money was paid to and

utilized by Debtor, that the rent credits given to June came from Debtor,

and that the payment checks given to Patricia and Ernie were written from

Debtor's bank accounts.[8]  All things considered, and contrary to Trustee's

assertion, this evidence adequately demonstrates that Debtor was

---

[8]  Interestingly, some of the checks to Patricia and Ernie were written on a
Gables of Pocatello account, some were from Gables Management, and some
from the Gables Management payroll account.  *See* Ex. 212.

MEMORANDUM OF DECISION – 13

obligated, perhaps along with Rasmussen, to repay Creditors.

However, this conclusion does not end the inquiry.  Trustee also

argues that whether the claims should be allowed in the bankruptcy case

depends upon the nature of the obligations owed by Debtor to Creditors.

Simply put, according to Trustee, the Court must determine whether

Creditor's transactions with Debtor were loans or investments.  This

characterization is important, because the treatment of such obligations is

different in the context of a bankruptcy case.  If the obligations are loans,

Creditors hold unsecured claims; if the transactions were "investments,"

Creditors may hold equity securities, and their right to share in

distributions in the bankruptcy case may be subordinate to that of

creditors.

**A.  The Transaction Documents**

The Court's determination of the meaning of the documents

executed between Rasmussen/Debtor and Creditors is controlled by state

law.  *NetBank, FSB v. Kipperman (In re Commercial Money Ctr., Inc.)*, 350 B.R.

MEMORANDUM OF DECISION – 14

465, 481 (9th Cir. BAP 2006).

The financial transaction documents before the Court are, on their face, equivocal at best, and do not adequately demonstrate whether Creditors' transactions with Debtor were loans or investments.  On the one hand, Creditors signed what were labeled "Investor" contracts, and speak in terms seemingly describing something other than a loan of money, *i.e.*, investments, dividends and disbursements.  Moreover, Ernie also entered into an "Investment Agreement" via the power of attorney for June.

On the other hand, Rasmussen signed two personal Notes to evidence the transactions, and the terms of June's deal were later amended via a letter, to which an amortization schedule was attached.  A DOT given to Creditors was also apparently executed, although never recorded, in order to secure the Note.  Finally, there is nothing in the documents which suggests Creditors were to acquire any ownership interest in Debtor.

**B.  Parol Evidence**

When parties reduce their agreement to a writing, and intend that

MEMORANDUM OF DECISION – 15

document to be a final statement of the terms of their agreement, the parol

evidence rule provides that evidence of any prior or contemporaneous

agreements or understandings between the parties which relate to the

same subject matter is not admissible to vary, contradict, or enlarge the

terms of the written contract. *Simons v. Simons*, 11 P.3d 20, 24 (Idaho 2000)

(citing *Tusch Enterprises v. Coffin*, 740 P.2d 1022, 1029 (Idaho 1987)).  Parol

evidence may, however, be considered to aid the court in determining the

intent of the drafter of a document if an ambiguity exists. *Simons*, 11 P.3d

at 24 (citing *Matter of Estate of Kirk*, 907 P.2d 794 (Idaho 1995)).  However,

"[i]f a contract's terms are clear and unambiguous, the contract's meaning

and legal effect are questions of law to be determined from the plain

meaning of its own words." *Bream v. Benscoter*, 79 P.3d 723, 726 (Idaho

2003) (citing *Albee v. Judy*, 31 P.3d 248 (2001)).  Here, the documents could

support both a conclusion that Creditors loaned money to Debtor, or one

that they invested money with Debtor.  As such, the Court is comfortable

resorting to parol evidence to determine the parties' intent.


MEMORANDUM OF DECISION – 16

Regrettably, the extrinsic evidence given to the Court does not clearly resolve the ambiguity.  Viewed one way, the record shows that the parties considered the transaction to be a loan.  For example, for tax purposes, Debtor generated and sent Ernie a 1099-INT form, indicating that $6,999.33 was paid to Ernie Geiger as interest in 2010.  Presumably, had Debtor considered the $333.33 payments to be dividends, Debtor likely would have sent Ernie a 1099-DIV form.  In addition, some of the check stubs for those same payments denote "Loans Payable."  Patricia also testified that Creditors never believed they were acquiring an equity interest in the Debtor via these transactions.  Finally, Debtor listed the obligation to Ernie Geiger on its Schedule F in the amount of $25,000 for a "loan."

There is also considerable evidence to show Creditors' were investing in Debtors' business.  Creditors identified the transactions as an "investment" on their proofs of claim, and referred to them as investments several times in their September 6, 2010, letter to Debtor.  Rasmussen

MEMORANDUM OF DECISION – 17

echoed this characterization when he referred to Creditors as investors in

his letter of October 29, 2010.

There was other evidence given to the Court that was completely

equivocal on its face.  For example, June's rent invoices describe the

$333.33 credit she received each month as an "investment interest credit."

Additionally, the pages detailing the financial breakdown of Gables

Management, LLC and Gables of Pocatello are in the nature of a report to

existing and potential investors, yet could easily be offered to a bank or

other lender to support a request for a loan.  Debtor's accounting records,

at least what there are of them, detail the $333.33 credits for June's rent as

an "investment," yet denote the expense as an "interest expense."  Finally,

Patricia testified that she believes the terms "investment" and "loan" are

interchangeable.

## C.  Idaho Law

The law provides some help to the Court.  *Black's Law Dictionary*

defines a "loan" as:

MEMORANDUM OF DECISION – 18

> 1.  An act of lending; a grant of something for temporary use.  2.  A thing lent for the borrower's temporary use; esp., a sum of money lent at interest.

*Black's Law Dictionary* 1019 (9th ed. 2009).  And the Idaho Credit Code

defines "loan," in pertinent part:

> "Loan" means, except as provided in paragraph (b) of this subsection:
>
> > (1) The creation of debt by the lender's payment of or agreement to pay money to the debtor or to a third person for the account of the debtor[.]

Idaho Code § 28-41-301(23).  The transactions between Creditors and

Debtor would comfortably fall within the definition of a loan under both

the Idaho Credit Code and *Black's*.

However, under the Idaho Uniform Security Act, a "security" is

defined as:

> a note; stock; treasury stock; security future; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit-sharing agreement; collateral-trust certificate;

MEMORANDUM OF DECISION – 19

> preorganization certificate or
> subscription; transferable share;
> *investment contract* . . . .

Idaho Code § 30-14-102(28) (emphasis added).  This act specifically

includes as an "investment contract":

> [A]n investment in a common enterprise with the
> expectation of profits to be derived primarily
> from the efforts of a person other than the
> investor.  "Common enterprise" means an
> enterprise in which the fortunes of the investor
> are interwoven with those of either the person
> offering the investment, a third party, or other
> investors . . . .

Idaho Code § 30-14-102(28)(d).

To this mix of statues and definitions is added the guidance from the

United States Supreme Court in two cases, *S.E.C. v. W.J. Howey Co.,* 328

U.S. 293 (1946), and *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975).

The legal analysis in those cases have been combined to create the so-

called *Howey-Forman* test to identify the existence of an investment

contract.  *State v. Gertsch*, 49 P.3d 392, 396 (Idaho 2002).  The Idaho

Supreme Court has adopted the *Howey-Forman* test to characterize

MEMORANDUM OF DECISION – 20

transactions under the Idaho Securities Act.  *Id.* (citing *State Dept. of Fin. v. Resource Serv. Co. Inc.*, 950 P.2d 249, 254 (Idaho 1997)).

The *Howey* case made clear that the definition of a security was purposefully broad so as "to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits."  328 U.S. at 299.  The test has three prongs to show the existence of an investment contract:  1) an investment of money, 2) a common enterprise, and 3) a reasonable expectation of profits to be derived from the entrepreneurial or management efforts of others.  *Howey,* 328 U.S. at 298-99; *Forman,* 421 U.S. at 852; *Gertsch,* 49 P.3d at 396.

As for the first prong, the *Resource Serv. Co.* case explains that an "'investment' typically involves parting with money for the purpose and in the reasonable expectation of making a profit."  950 P.2d at 254.  This prong is clearly met here, as Creditors gave Debtor $50,000, and undisputably expected to receive interest payments of sixteen percent per annum, along with repayment of their principal after three years.

MEMORANDUM OF DECISION – 21

The second prong concerns whether a "common enterprise" exists. In order to determine this, courts have looked to whether there is "horizontal commonality" or "vertical commonality." *Gertsch*, 49 P.3d at 397. Horizontal commonality involves the "situation where each individual investor's fortune is tied to the fortunes of the other investors by the pooling of assets, often combined with the pro-rata distribution of profits. *Id.* (citing *S.E.C. v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1134 (9th Cir. 1991)). On the other hand, vertical commonality "depends upon the relationship between each individual investor and the promoter and occurs where 'the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties.'" *Id.* (quoting *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999)).

This second prong is also met under these facts. Horizontal commonality is present because the success of Debtor's business was dependent upon its ability to raise a sufficient amount of invested funds to

MEMORANDUM OF DECISION – 22

operate.  Vertical commonality is also present.  Creditors gave their money

to Debtor and at that point relinquished control over it.  In other words,

thereafter, their fortunes were dependent on the efforts and success of

those seeking the investment – Debtor and Rasmussen, as well as third

parties – the economy, willingness of banks to lend to Debtor, and overall

desire for facilities like Gables.

Creditors also held a reasonable expectation of profits to be derived

from the entrepreneurial or management efforts of others.  This prong of

the *Howey-Forman* test anticipates profits generally defined as either

"capital appreciation resulting from the development of the initial

investment . . . or a participation in earnings resulting from the use of

investors' funds." *Forman*, 421 U.S. at 852.  However, it is under this prong

that the present transactions at issue begin to falter.  It does not appear

that Creditors could expect either capital appreciation or participation in

earnings generated by Debtor.  Instead, Creditors were promised a return

of their full investment after receiving three years' worth of fixed interest

MEMORANDUM OF DECISION – 23

payments, or they could leave their funds with Debtor and continue to receive disbursements, but they would be paid out every six months.  In essence, Creditors could continue to receive interest payments at the rate of sixteen percent on the full $25,000 for as long as they chose, but under their deals with Debtor, Creditors' principal investment would not grow.[9]

In addition, while transactions resembling loans have been held to be investment contracts, such appears to be more likely when the interest rates are extremely high.  *See Gertsch*, 49 P.3d at 399 ("Although the promise of a fixed rate of return could preclude a finding of an investment in some circumstances, the extremely high rate promised by Gertsch – the equivalent of one hundred percent annually in some cases – demonstrates that these transactions were something more than loans or savings account deposits.")  In this case, while the interest rate payable to Creditors was certainly above-market, considering the private nature of their dealings, the Court can not characterize those rates as extreme.

---

[9] Sixteen percent interest on $25,000 yields an annual interest payment of $4,000, or $333.33 per month.  $25,000 x .16 = $4,000 ÷ 12 = $333.33.

MEMORANDUM OF DECISION – 24

While it is a close call, ultimately, the evidence submitted shows the Creditors' transactions seem to better fit the definition of loans than investments.  In one instance, Debtor also characterized the transaction as a loan in its Schedule F.  Patricia testified that she never believed the monies given to Debtor were to be anything other than loans.  While the proof is quite equivocal, all things considered, the Court finds that the parties intended the transactions at issue to be loans rather than investments.  The transactions are therefore properly treated as debts in the bankruptcy case.

### V.
### Conclusion

Trustee's objection to Creditors' proofs of claim will be denied by separate order.  Without regard to whether Rasmussen was liable for repayments of the obligations, the Court concludes Debtor was responsible to repay the amounts advanced by Creditors, including interest.  Additionally, the Court finds that the parties intended these transactions to be loans, not investments.  As a result, the Court concludes that

MEMORANDUM OF DECISION – 25

Trustee's objections should be denied, and Creditors' claims should be

allowed.

A separate order will be entered.

Dated:  May 21, 2012

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 26